**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **GEORGE WOODS III, a minor,** ) | |
| **by his mother and next friend,** ) | |
| **Catherine Woods,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 04 C 7902** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of the Social Security** ) | |
| **Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

George Woods, who is now eighteen years old, appeals from the Social Security

Administration's (SSA) decision to terminate his Supplemental Security Income (SSI) benefits.

Both George and the Commissioner have filed motions for summary judgment. Based on our

review of the Administrative Law Judge's (ALJ) decision and the record generated below, the

Court finds the ALJ fully and fairly developed the record, but his decision is not supported by

substantial evidence. The Court therefore reverses and remands the case for further proceedings.

## Facts

In July 1992, Catherine Woods, George's mother, applied for SSI on George's behalf. R.

58-70. SSA awarded George disability benefits because he suffered from mental retardation and

infantile esotropia (crossed eyes). R. 57A. In July 1998, SSA conducted a continuing disability

review; it found that George's IQ still fell in the mental retardation range and therefore continued his disability benefits.  R. 71.

In the fall of 2001, SSA initiated a second continuing disability review in which it contacted Mrs. Woods, teachers, and consultative physicians.  On April 1, 2002, SSA notified Mrs. Woods that George was no longer disabled and his disability benefits would therefore be terminated.  R. 76.  Mrs. Woods filed a timely request for reconsideration.  R. 81.  On August 23, 2002, SSA denied this request.  R. 87.  Mrs. Woods subsequently filed a timely request for a hearing before an ALJ.  R. 97.  On March 6, 2003, ALJ John Kraybill held a hearing during which George, Mrs. Woods, and consultative physician Kevin Kessler testified.  On April 7, the ALJ issued a decision finding George was no longer disabled.  R. 20-23.  On May 29, Mrs. Woods requested review by the Appeals Council.  R. 7.  On October 22, the Appeals Council denied Mrs. Woods's request for review, making the ALJ's decision the final agency determination.  R. 4-6.  Mrs. Woods sought judicial review in this Court pursuant to 42 U.S.C. § 405(g).

In July 1992, when George initially applied for and was awarded SSI benefits, he was five years old.  R. 58-70.  SSA found, based on the evaluations of two consultative physicians, that George had two disabling impairments – mental retardation and infantile esotropia.  R. 57A. Dr. Erwin Baukus found that George's verbal IQ score was 61, his performance IQ score was 50, and his full- scale IQ score was 51.  George therefore met the listing for mental retardation.  R. 220-21.  Dr. David Lubeck diagnosed George with infantile esotropia (crossed eyes) and nystagmus (floating eye).  R. 217-18.

When SSA conducted its first continuing disability review in the summer of 1998,

George was eleven years old, and he had completed fifth grade. R. 71. For this review, SSA collected medical records from three physicians, George's teachers, and Mrs. Woods. According to consultative psychologist William Higler, George had a verbal IQ score of 64, a performance IQ score of 50, and a full-scale IQ score of 53, which meant he was still in the mild mental retardation range. R. 251-53. Treating ophthalmologist Corazon Balbarin stated George still had crossed eyes even though he had undergone eye surgery, and consultative ophthalmologist Karl Fritz believed George still had one lazy eye. R. 242, 248. Therefore, SSA found that George remained disabled. R. 71.

As part of the 1998 review, SSA also collected statements and records from George's school, Fairmont Junior High in Joliet, Illinois. R. 165. By the time George was in fifth grade, he was enrolled in regular classes, but he received speech therapy services. R. 165. Prior to fifth grade, however, George had been in classes for learning-disabled children for most of his time in school. R. 38, 228. According to George's individualized education program for fourth grade, teachers recommended him for regular classes because learning disabled classes were "too restrictive for [his] educational and social development." R. 235. George's fifth grade teacher, however, stated that "George only receives speech services at this time, but teachers feel his removal from other Special Ed. services was premature." R. 167.

During this time, George's teachers also expressed varying opinions about his ability to stay on task and interact with others. George's third grade teachers noted that he had "some difficulty" following directions and withdrew emotionally when he became angry. R. 224. George's fourth grade teachers reported a number of behavioral problems, such as "off task behaviors, moving around the room, talking back to authority figures, fighting with peers,

namecalling, and occasional resistance to staff requests that results in the need for physical management." In fact, a teacher who appears to have been George's fourth grade speech therapist stated that many of their sessions had been hindered by George's "poor anger control," "inability to concentrate," and "internal and external suspensions of 1 to 5 days duration." R. 233. George's fifth grade teacher expressed some of the same concerns, stating that he had problems keeping his attention, staying on-task, and completing assignments. She also stated that George had become "more beligerant [sic] and aggressive, " necessitating his removal from the classroom and the loss of privileges. R. 165-66.

Mrs. Woods also submitted childhood functioning reports during the course of the 1998 continuing disability review. According to Mrs. Woods, George often fell when running or riding his bike; he was teased by other children and often got into fights; and he had difficulty maintaining his concentration and completing activities. R. 157-164.

In 2001, SSA began its second continuing disability review. It again collected information from physicians, teachers, and George's mother. After examining and testing George at the SSA's request, consultative psychologist Erwin Baukus submitted a report on March 11, 2002. He determined that George's verbal IQ score was 75, his perfomance IQ score was 71, and his full-scale IQ score was 71. He also determined that George read at a third grade level. Dr. Baukus diagnosed George with borderline intellect and a learning disorder in reading. Dr. Baukus opined that George's IQ score had increased from earlier levels either because he had not put forth his "best performance" during his initial examination in 1992 or because he had "excelled in progress" due to nine years of education. Dr. Baukus also summarized George's educational records, which, at the time of Dr. Baukus's examination, included school records

4

gathered for the 1998 continuing disability review plus a January 2002 school activities questionnaire from Joliet Central High School. According to Dr. Baukus's review, "[George] never had problems with deportment or discipline in school and was never suspended or expelled." He also observed that when George visited his office, he was "cooperative and docile." R.258-61.

Consultative ophthalmologist Mark Fritz also examined George in June 2002. He found that George's uncorrected vision was 20/30 in his right eye and 20/40 in his left eye, but that glasses could correct this to 20/20 in his right eye and 20/30 in his left eye. Dr. Fritz did not clearly state whether George still suffered from esophoria and nystagmus at this time. R. 274-76.

Joliet Central High School also provided information for the continuing disability review. On January 7, 2002, a school counselor submitted a school activities questionnaire which stated that George was enrolled in regular classes; she did not fill out the rest of the questionnaire. R. 190-93. The counselor also submitted George's first semester transcript, which showed he had received five Fs and two Ds while enrolled in regular courses. R. 207. These were the current school records that were available to Dr. Baukus during his 2002 evaluation of George. On May 9, 2002, special education teacher Michelle Steffe submitted another school activities questionnaire. She reported that George was now in a class for educable mentally handicapped, learning disabled, and behaviorally disabled students. Ms. Steffe stated that George did not have any problems with concentration or behavior. R. 203-06.

Mrs. Woods also submitted childhood functioning reports concerning her son. On November 11, 2001, Mrs. Woods reported that George had difficulty acquiring and using

information, could not concentrate on and complete tasks, had difficulty resolving conflicts with others, and did not understand the difference between how to treat peers and how to treat adults. She did, however, state that he avoided fights, respected adults, and followed rules. R. 186-87. On May 12, 2002, Mrs. Woods submitted another childhood functioning report. She again reported that George had trouble acquiring and using information, could not work independently, and could not resolve conflicts. At this time, she added that George also could not avoid fights with peers. R. 210-13.

On March 6, 2003, George, his mother, and consultative psychologist Kenneth Kessler attended a hearing conducted by ALJ John Kraybill. It is unclear how long the hearing lasted, but the transcript was only twenty pages long. R. 23-53.

At the outset of the hearing, the ALJ told George and his mother that they had the right to representation: the ALJ said that he had a "duty to develop the record" whether or not they had an attorney, but "[an attorney] may have some questions I failed to ask, maybe even to better assist you presenting your case." He said it was his policy to allow one postponement to seek representation, but he told Mrs. Woods and George they could proceed with the hearing if they wished. Mrs. Woods decided to proceed that day. R. 34-35.

The ALJ then asked whether Mrs. Woods would be serving as George's representative or as a witness. Mrs. Woods stated, "I don't really understand like – because by him being under age so I was just coming with him." The ALJ told Mrs. Woods that if she wanted to testify, she would have to be a witness, but otherwise, she could act as a representative. Mrs Woods responded, "Represent–because I think he can talk. I'll be a witness." The ALJ then confirmed that Mrs. Woods would be a witness, explained the function of the hearing, and asked Mrs.

Woods to wait outside while he questioned George. R. 35-36.

At the time of the hearing, George had just turned sixteen, and he attended tenth grade at Joliet Central High School. He testified that his mother gave him a ride to school each day. He took "special classes" for math, English, health, science, and computers, and he said his grades were "good." He said English was his most difficult subject, and he had trouble reading and remembering what he read. He said he was not enrolled in a gym class, but he said he had been in gym the year before, and he played sports with his friends. George also testified that he had not had any detentions or suspensions in ninth or tenth grade. R. 37-41.

George stated that he did chores around the house, such as cleaning his room. He went to bed around 9:00 p.m. and got up in the morning for school. He said he did not give his mother a difficult time when he went to bed and that his mother woke him up in the morning. He said he did not have trouble sleeping. R. 41-42. George testified that he liked to play basketball, ride his bike, play video games, and listen to music after school. R. 38-39. During the summer, he would stay at home, watch television, and listen to music. R. 42.

Mrs. Woods testified next. She said that George had problems learning and seeing. The ALJ asked Mrs. Woods whether George was supposed to wear glasses. She responded that she was trying to get an appointment to get George's eyes rechecked and to order new glasses, but she said she had not been able to yet. R. 44-45.

The ALJ asked Mrs. Woods whether George had any problems at school. She testified that George's social worker had told her George failed in regular classes but was "doing okay" in classes for learning disabled students. R. 45-46. She testified that George would have to go to summer school in order to make up for the semester he failed in ninth grade. R. 49.

The ALJ also asked Mrs. Woods whether the school had contacted her about any behavior problems. Mrs. Woods said she had received many letters from the school. She testified that George had gotten into fights with students who teased him and that he had been suspended from school for ten days. Both Mrs. Woods and the ALJ seemed confused about the dates of this suspension: it is unclear from the transcript whether George was suspended at the end of ninth grade or the beginning of tenth grade. R. 46-47.

The ALJ then proceeded to question Mrs. Woods about George's activities at home. Mrs. Woods stated that she only allowed George to take out the trash and clean the bathroom sometimes. She said she did not allow him to set or clean the table because he had broken dishes before. She confirmed that he liked to watch television and play video games. She said, however, that George and his older brother usually fought. R. 48-49.

Finally, the ALJ questioned Kevin Kessler, a consultative psychologist who had reviewed George's file but never examined him. Dr. Kessler summarized the intellectual assessments performed by Dr. Baukus in 1992, by Dr. Higler in 1998, and by Dr. Baukus again in 2001. He testified that in 1992 and 1998, George's IQ ranged "from 50 up into [the] 60s," but that in 2002, "the scores were above 70." He also noted that "Dr. Baukus felt [George's performance in 2002] was a minimal estimate of his functioning." Dr. Kessler stated it was "not surprising" that George would "do poorly" in a regular classroom without support services but that he was then "reclassified into more appropriate educational programming." R. 50.

Dr. Kessler then testified that in his opinion, George no longer met a listed impairment under the Social Security regulations. He believed George's learning disability caused a marked impairment in acquiring and using information, but he said George had less than marked

impairments in maintaining attention and interacting and relating with others. Dr. Kessler stated that "I'm not sure we should penalize him for getting into fights with others who make fun of him." He stated that George did not exhibit impairments in any other areas of functioning. R. 51-52.

After the hearing, George's case manager and special education teacher Stacey Johnson submitted an updated school activities questionnaire dated February 10, 2003. George's teacher reported that he "can lose concentration and get off task–mostly socializing with peers. Tends to lose forget work." She also stated that George "can be forgetful with assignments. Tries to be organized." She did not report any problems with George's behavior. R. 311-12.

Finally, the administrative record includes childhood disability evaluations by two psychologists and one physician hired by SSA to review George's file. None of them found that George met the mental retardation listing: all of them found that George had a marked limitation in acquiring and using information, but none of them believed that George had a limitation in any other domain. R. 262-67; 277-82.

## Discussion

Disabled children who are receiving disability benefits must undergo periodic reviews to determine whether they are still eligible to receive such benefits. 20 C.F.R. § 416.994a(a). During these reviews, SSA conducts a sequential analysis of the child's condition in which it determines whether the child's condition has medically improved; whether the child's condition – despite medical improvement – meets or equals the listed impairment it met or equaled before; and whether the child's condition – despite medical improvement – meets, medically equals, or functionally equals a currently listed impairment. If SSA makes a determination that is favorable

to the child at any stage in the analysis, it need not review further.  20 C.F.R. § 416.994a(b).

In the instant case, the ALJ found that there was "clear evidence" of medical improvements in George's vision and cognitive functions.  Specifically, he relied on the medical evidence presented by Dr. Fritz, Dr. Baukus, and Dr. Kessler.  Dr. Fritz stated that George's corrected vision now was 20/20 in his right eye and 20/30 in his left eye.  Dr. Baukus and Dr. Kessler – relying on Dr. Baukus's report – noted that George's IQ scores had increased significantly, but they also stated that that this was likely not "a true picture of [George's] best performance."

The ALJ found that George had the severe impairment of a learning disorder.  Because, however, a learning disorder does not meet or equal a listed impairment, the ALJ engaged in a five-step evaluation to determine whether George's learning disability functionally equaled a listed impairment.  R. 19-23.  For a child's condition to functionally equal a listed impairment, he must have an "extreme" limitation in one of six domains or a "marked" limitation in two of six domains.  The domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being.  20 C.F.R. § 416.926a.

According to the ALJ, George had a marked limitation in acquiring and using information; less than marked limitations in attending and completing tasks and interacting and relating with others; and no limitations in the remaining three domains.  R. 21-23.  The ALJ initially found that George had a marked limitation in acquiring and using information based on Dr. Kessler's testimony and George's performance in school.  The ALJ found that George had a less than marked limitation in attending and completing tasks based on Dr. Kessler's testimony

and Ms. Johnson's questionnaire.  The ALJ also found that George had a less than marked limitation in interacting and relating with others based on Dr. Kessler's testimony, Dr. Baukus's report, and Ms. Johnson's questionnaire.  Finally, the ALJ found no evidence that George had limitations in any other domain.   R. 21-23.

George argues that the ALJ made several errors which justify reversal and remand.  Specifically, George contends that the ALJ failed to obtain a valid waiver of representation, did not develop the record fully, and failed to justify his decision with substantial evidence.  We address each of these arguments in turn.

## 1.      Invalid waiver of representation

A claimant seeking disability benefits has a statutory right to representation at a hearing before an ALJ.  42 U.S.C. § 406.  A claimant may waive that right, but only "'if given sufficient information to enable him to intelligently decide whether to retain counsel or proceed *pro se*.'"  *Thompson v. Sullivan*, 933 F.2d 581, 584 (7ᵗʰ Cir. 1991) (quoting *Hawwat v. Heckler*, 608 F. Supp. 106, 108 (N.D. Ill. 1984).  To obtain a valid waiver of representation, the ALJ must address with the claimant the ways in which an attorney can assist him, the availability of free representation or contingency arrangements, and the statutory limitations on attorney's fees.  *Id.*

The ALJ stated that Mrs. Woods was "fully apprised" of her right to representation, and she "knowingly and voluntarily elected to waive that right."  R. 18.  The hearing transcript, however, does not suggest this characterization.  The transcript indicates that the ALJ informed Mrs. Woods of the right to representation and told her he would give her one continuance to find an attorney.  He arguably explained the potential benefits of representation by advising Mrs. Woods that, "if you have an attorney, or other representative, they may have some questions I

failed to ask, maybe even better assist you in presenting your case." The ALJ did not, however, explain the mechanisms for retaining an affordable attorney, which are "'particularly relevant in disability cases where shortage of funds is likely to be an issue for the claimants.'" *See Thompson*, 933 F.2d at 585 (quoting *Hawwat*, 608 F. Supp. at 109); R. 34-35. Because the ALJ omitted this crucial information, Mrs. Woods's waiver of representation was not valid. This Court can only reverse and remand the ALJ's decision on this basis, however, if the ALJ also failed to fully and fairly develop the record. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994).

2.      **Development of the record**

The ALJ has a duty to develop a full and fair record. *Thompson*, 933 F.2d at 585. The ALJ's duty is heightened when the claimant is not represented by counsel: he must "'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Id.* (quoting *Smith v. Secretary*, 587 F.2d 857, 860 (7th Cir. 1978)).

When an ALJ has not obtained a valid waiver of representation from the claimant, the Commissioner bears the burden of demonstrating that the ALJ performed his duty to fully and fairly develop the record. *Binion*, 13 F.3d at 245. If the Commissioner demonstrates the ALJ fulfilled his duty to develop the record, the claimant can rebut this showing by establishing prejudice or an evidentiary gap. *Id.* Generally, however, there must be a "significant omission" in the record before a court can remand a case on this ground. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).

George contends that the Commissioner has not met her burden of proving that the ALJ fully and fairly developed the record on two issues. Specifically, Woods argues that the ALJ should have inquired more into George's IQ score and his functioning in the six domains

relevant in a childhood disability determination. The Commissioner maintains that the ALJ fully and fairly developed the record on each of these issues, and alternatively, that George has established no "significant omission[s]" in the record.

First, George argues that the Commissioner has not shown that the ALJ fully developed the record on the question of whether George still met the listing for mental retardation. There is a significant difference between the results of George's first two rounds of IQ tests– when his IQ scores ranged from the low 50s to the low 60s – and his most recent round of IQ tests – when his scores ranged from the low to mid 70s. R. 220-21, 251-53, 260-61. George therefore encourages us to follow the approach in *Evans v. Massanari*, No. 98C 6196, 2001 WL 969083 (N.D. Ill. Aug. 21, 2001), in which a district judge ordered additional psychological testing because there were discrepancies among a claimant's IQ testing scores. *See id.* at *12.

George, however, ignores a key difference between himself and Evans: at the time of the hearing, George was a sixteen year-old minor whereas Evans was a forty-nine year-old adult. *See id.* When a minor claimant's IQ is at issue, a Social Security regulation requires ALJs to rely only on IQ test results that are "sufficiently current for accurate assessment." Specifically, ALJs should consider IQ test results obtained before age seven current for only one year if the child's IQ is above 40, and they should consider results obtained between the age of seven and sixteen current for two years when the child's IQ is above 40. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00D10. Under this regulation, George's 1992 IQ score was current only until 1994, and his 1998 IQ score was current only until 2000. Only George's 2002 IQ test scores could have been considered current at the time the ALJ made his determination in April 2003. In short, the ALJ had no obligation to inquire in detail about the discrepancy, because George's 1992 and

1998 scores could not be used for the purposes of the ALJ's determination.

Next, George argues that the Commissioner has not demonstrated that the ALJ fully developed the record regarding whether his learning disability is functionally equivalent to a listed impairment. During the hearing, the ALJ examined George, Mrs. Woods, and Dr. Kessler regarding George's functioning in six domains, including acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being. George indicated that he only had problems with acquiring and using information, particularly in reading, but Mrs. Woods indicated that George also had problems with attending and completing tasks (e.g., doing homework), interacting and relating with others (e.g., being suspended for getting into a fight), and moving and manipulating objects (e.g., dropping dishes when trying to put them away). *See* R. 37-49. The ALJ asked George and Mrs. Woods some follow-up questions, but he did not inquire in detail about George's behavior, nor did he examine either George or Mrs. Woods about discrepancies between their own statements or between their statements and the rest of the documentary record.

Dr. Kessler testified that George had a marked impairment in acquiring and using information based on his IQ; he had a less than marked impairment in attending and completing tasks; and he had a less than marked impairment in interacting and relating with others. With regard to the last domain, Dr. Kessler remarked, "I'm not sure we should penalize him for getting into fights with others who make fun of him." R. 52. The ALJ did not ask Dr. Kessler any follow-up questions about these issues, nor did he confront Dr. Kessler with contradictory testimony from George or Mrs. Woods or with conflicting evidence from the documentary

record.

The documentary record contained much evidence regarding George's functioning with regard to the six domains. The record included three school questionnaires filled out by George's teachers: one partially completed questionnaire from January 2002, one completed questionnaire from May 2002, and one received after the hearing from Stacey Johnson, George's case manager and special education instructor. R. 311-12. These documents offered varied comments regarding George's academic performance, concentration, and behavior. However, the record did not include certain documents that the ALJ had requested prior to the hearing, particularly George's transcript and special education documentation (e.g., an individualized educational program and a multidisciplinary conference report). *See* R. 310.

George contends that the ALJ failed to fully and fairly develop the record on these issues because he failed to question Dr. Kessler thoroughly and obtain additional educational records from George's school.[1] The Seventh Circuit has stated that "[w]hile the ALJ has a heightened duty to make sure that the record is developed when a claimant is unrepresented, ... how much evidence to gather is a subject on which we generally respect the Secretary's reasoned judgment." *Luna*, 22 F.3d at 692.

It is true that the ALJ did not question Dr. Kessler in great detail about George's functioning, and that he did not follow up with George's school to obtain updated educational

---

[1] We note that the ALJ's questioning of George and Mrs. Woods was quite limited too – only seven and six transcript pages respectively. *See* R. 37-49. The Seventh Circuit has held that such minimal questioning may constitute a failure to fully develop the record when the claimant, like George, is a minor or has a mental impairment. *Thompson*, 933 F.2d at 586 ("superficial questioning of inarticulate claimants or claimants with limited education is likely to elicit responses which fail to portray accurately the extent of their limitations."). In his briefs, however, George does not claim that the ALJ failed to question him and his mother thoroughly, and for that reason, we do not address the issue.

records. The record does, however, include several statements regarding George's functioning level from George, his mother, his examining physicians, and his school. Furthermore, we note that George "has not pointed to any specific facts that were not brought out during the hearing" as a result of the limited questioning of Dr. Kessler or the failure to obtain additional school records. *See Binion*, 13 F.3d at 246.

### 3.    Substantial evidence

The Court's review of the findings in the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This is a deferential standard: we cannot "substitute our judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence or deciding questions of credibility." *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999). We must, however, overturn a denial of benefits if, after examining the ALJ's decision and reviewing the entire record, we find that the decision is not supported by the evidence, *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002), or does not build  "an accurate and logical bridge from the evidence to [the] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

George contends that two of the ALJ's findings  – that there was a medical improvement in George's cognitive functioning and that George's learning disability was not functionally equivalent to a listing – are not supported by substantial evidence.

The ALJ's finding that George's intellectual functioning had medically improved is supported by substantial evidence. The ALJ recognized that George's IQ scores ranged from the

low 50s to the low 60s in 1992 and 1998, but he stated that they had increased to the low to mid 70s by 2002.  He also cited to comments from Dr. Kessler – based on the 2002 report by Dr. Baukus – that even George's 2002 IQ scores "were not a true picture of [George's] best performance" because George was "laid back" during the testing, manipulated other objects, and was not wearing glasses.  Based on this evidence, the ALJ found there was "clear evidence" of medical improvement in George's cognitive functioning.  R. 20.

George argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not fully discuss his reasons for accepting the most current scores over the older scores.  Specifically, he states the ALJ neither relied on the regulation cited by the Commissioner nor explained why the 2002 IQ scores were more valid than the earlier scores.  In the context of discussing whether a claimant meets a listed impairment, the Seventh Circuit has held an ALJ's failure to refer to the listing in his decision is not cause for reversal and remand unless the ALJ's analysis is "perfunctory."  *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004) (citing *Brindisi v. Barnhart*, 315 F.3d 783, 786-87 (7th Cir. 2003)).

Despite the ALJ's failure to cite the regulation regarding the validity of childhood IQ scores, the ALJ's analysis was not perfunctory.  He cited the results of each of George's IQ tests, and he found that the 2002 results were valid based on Dr. Baukus's observations during the testing, Dr. Kessler's testimony about the results, and the reports of three other consultative examiners who reviewed George's record.  R. 19-20.  The Court therefore concludes that substantial evidence supports the ALJ's finding that George's 2002 IQ scores were valid and indicated a significant medical improvement in his cognitive functioning.

The ALJ next stated that George has a severe impairment of a learning disorder, but

because it did not meet or equal a listed impairment, he analyzed whether George's learning disorder caused limitations that functionally equal a listing, i.e., it resulted in an extreme limitation in one domain of functioning or marked limitations in two domains of functioning. *See* R. 21; 20 C.F.R. § 416.926a(a). The ALJ ultimately found that George had a marked limitation in acquiring and using information and less than marked limitations in attending and completing tasks and interacting and relating with others.

When determining the effects of a child's impairment on his functioning, an ALJ must consider all the relevant information in the claimant's case record that helps the ALJ determine the claimant's functioning, including his signs, symptoms, and laboratory findings, and the descriptions the ALJ has about the claimant's functioning from his parents, teachers, and other people who know him. 20 C.F.R.§ 416.926a(e)(1)(i). George contends that the ALJ's determinations are not supported by substantial evidence because he did not discuss evidence provided by Mrs. Woods or Ms. Johnson's February 2003 school activities questionnaire. He argues that these omissions are particularly relevant to the ALJ's evaluation of two of the domains: attending to and completing tasks, and interacting and relating with others.

In determining that George had a less than marked impairment in attending to and completing tasks, the ALJ cited three pieces of evidence: Dr. Kessler's testimony that George had a less than marked limitation in this domain; a comment from Dr. Baukus's 2002 report to the effect that George did not put forth his best effort, but persevered during testing; and a May 2002 school activities questionnaire from George's ninth grade special education teacher Ms. Steffe, in which she reported "no problems with attention, concentration, and on task behavior." R. 21. The ALJ does not, however, refer to a February 2003 school activities questionnaire from

George's tenth grade special education teacher Ms. Johnson, in which she reports that he "lose[s] concentration," "get[s] off task," "tends to lose focus," and "forget[s] work, "even though he "tries to be organized."  R. 311.

Though the ALJ need not discuss every piece of evidence in its decision, he may not "select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  In this case, the ALJ relied on the earlier school questionnaire regarding George's ability to concentrate, but he did not explain why he rejected the later one.  It is conceivable that the ALJ did not find the later report credible or that he believed it did not provide evidence of a marked impairment.  The ALJ's decision, however, did not reflect that he had considered this significant piece of evidence, and it certainly did not "articulate at some minimal level his analysis of the evidence." *See Rice*, 384 F.3d at 369-70 (citing *Brindisi*, 315 F.3d at 786-87).   The Court therefore finds that the ALJ's determination that George had a less than marked impairment in attending to and completing tasks is not supported by substantial evidence.

Next, in determining that George had a less than marked impairment in interacting and relating to others, the ALJ referenced Dr. Kessler's opinion that George had a less than marked impairment in this domain; Dr. Baukus's comment that George was "docile and cooperative;" and Ms. Steffe's May 2002 questionnaire stating that George behaved appropriately.  R. 21-22. The ALJ also cited Dr. Baukus's report in support of the proposition that "[t]he claimant has never had problems at school with deportment, and he has never been suspended or expelled.  He visits with family and friends and exhibits appropriate social behavior."  R. 22.

This last statement overlooks several pieces of evidence in the record indicating that

George has had problems interacting and relating with others. School records from fifth grade indicate that George was "beligerant [sic] and aggressive" and that he was suspended multiple times for one to five days. R. 166, 231. Mrs. Woods's written submissions and oral testimony indicate that these problems continued through the period at issue at the hearing. In her responses to written questionnaires, Mrs. Woods stated that George had difficulty getting along with his peers, R. 198, 210, and in her oral testimony, she stated that George was suspended from school for ten days during the year prior to the hearing. R. 46-47.

It is conceivable that the ALJ decided that the school records were too old to be relevant and that Mrs. Woods was not credible. His decision, however, does not reflect that he considered this evidence at all. An ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Because the ALJ failed to address the evidence presented by Mrs. Woods regarding George's ability to interact and relate with others, his decision that George had a less than marked limitation in this domain is not supported by substantial evidence.

**Conclusion**

For the reasons stated above, the Court grants George's motion for summary judgment (docket no. 9) and denies the Commissioner's motion for summary judgment (docket no. 13). The Clerk is directed to enter judgment reversing the denial of benefits and remanding the case to the Social Security Administration for further proceedings.

                                      /s/ Matthew F. Kennelly
                                      MATTHEW F. KENNELLY
                                    United States District Judge

Date: November 4, 2005